# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

JUL 0 6 2018

JAMES N. HATTEN, Clerk
By: ⟨signature⟩ Deputy Clerk

| | |
|---|---|
| UNITED STATES of AMERICA *ex rel.* Adi Demirovic,<br><br>STATE OF GEORGIA ex rel. Adi Demirovic,<br>     and<br>Adi Demirovic,<br><br>    Plaintiffs, Plaintiff/Relator,<br><br>    v.<br><br>Georgia Clinic, P.C.,<br><br>Naresh K. Parikh, M.D.,<br><br>Galina F. Vayner, M.D.,<br><br>Kota R.  Reddy, M.D.,<br><br>Mahesh C. Patel,<br><br>    and<br><br>Ganesha RX Care Group 3, LLC d/b/a Georgia Discount Pharmacy,<br><br>    Defendants. | FILED IN CAMERA AND UNDER SEAL<br><br>Civil Action File No.: **1 18-CV-3248**<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF UNDER 31 U.S.C. § 3730 FEDERAL FALSE CLAIMS ACT**<br><br>Jury Trial Demanded |

4

Table of Contents

| | | |
|---|---|---|
| I. | INTRODUCTION TO THE FALSE CLAIMS | 6 |
| II. | **STATEMENT OF THE CASE** | 10 |
| III. | PARTIES | 11 |
| | **A.** | **Relator** | **11** |
| | **B.** | **Government Plaintiffs** | **11** |
| | **C.** | **Defendants** | **12** |
| IV. | JURISDICTION AND VENUE | 13 |
| V. | **LEGAL AUTHORITY** | 15 |
| | **A.** | **False Claims Act** | **15** |
| | **B.** | **Medicare & Other Federal Healthcare Programs** | **15** |
| | **C.** | **The Anti-Kickback Statute** | **23** |
| | **D.** | **Stark Act** | **27** |
| | **E.** | **The Beneficiary Inducement Statute** | **28** |
| VI. | **FACTUAL BACKGROUND** | 31 |
| | **A.** | **Relator Adi Demirovic** | **31** |
| | **B.** | **Defendant's Organizational & Operational Structure** | **32** |
| VII. | **DEFENDANTS' CONDUCT** | 36 |
| | **A.** | **The Recruitment Scheme** | **36** |
| | **B.** | **Defendants' Use of "Recruiters" to Target Medicare and Medicaid Patients** | **41** |
| | **C.** | **Defendants' False Claims for Medically Unnecessary Stress Tests** | **51** |
| | **D.** | **Free Personalized Transportation and Other Services and Payments to Obtain Government Healthcare Business** | **62** |
| | **E.** | **Georgia Clinic's Sale of Referrals to Defendant Pharmacist and Pharmacy** | **64** |
| VIII. | **COUNTS** | 68 |
| | **COUNT ONE** | **68** |

Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)                68

Defendants' Submission of False Claims for Services Rendered in
Violation of the Anti-Kickback and Beneficiary Inducement Statutes, 42
U.S.C. §§ 1320a-7a, 7b                                             68

COUNT TWO                                                          69

Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)                69

Defendants' Submission of False Claims for Medically Unnecessary
Services, 42 U.S.C. § 1320a-7a                                     69

COUNT THREE                                                        70

Violation of Stark Law, 42 U.S.C. § 1395nn                         70

Defendant Georgia Clinic's Cash-for-Referral Arrangement with
Defendant Georgia Discount Pharmacy's On-site Pharmacy            71

COUNT FOUR                                                         72

Violation of Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)        72

COUNT FIVE                                                         73

Violation of Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 *et
seq.*   73

IX.    PRAYER FOR RELIEF                                           74

NOW COMES **Adi Demirovic,** Plaintiff Relator, through his attorneys Cross Law Firm, S.C., by Nola J. Hitchcock Cross and local counsel Bracker & Marcus LLC, by Julie K. Bracker and states that this is an action brought on behalf of the **United States of America** and **the State of Georgia** by **Adi Demirovic** against **Georgia Clinic, P.C.**, its controlling owner and Chief Executive Officer, **Naresh Parikh, M.D.,** its employed staff physicians **Galina Vayner, M.D.** and **Kota Reddy, M.D.** (collectively, "Georgia Clinic"); and its contracted on-site pharmacist and pharmacy **Mahesh C. Patel** and **Ganesha RX Care Group 3, LLC** (d/b/a Georgia Discount Pharmacy) (collectively with Patel, "**Georgia Discount Pharmacy**"), pursuant to the federal civil False Claims Act, 31 U.S.C. §§3729, *et seq.* ("FCA") and the Georgia False Medicaid Claims Act, Ga. Code Ann. §§49-4-168 to 49-4-168.6 ("GFMCA") for knowingly submitting or causing the submission of false claims for payment to the United States of America and the State of Georgia. Relator also brings this action on behalf of himself to obtain a Relator share of the damages to the United States and Georgia under the FCA and GFMCA respectively, along with reasonable attorneys fees and costs.

## I.    INTRODUCTION TO THE FALSE CLAIMS

1.    Using nationality-aligned "Recruiters" whom **Defendant Georgia Clinic** *pays per patient referral*, Defendants target Medicare and Medicaid Beneficiaries for medically unnecessary and unsolicited "stress tests" and other medical procedures, for the sole purpose of submitting false claims for payment to and obtaining payment from Government health plans.

2.    **Georgia Clinic** induces targeted Government Beneficiaries to undergo medical services by offering free bespoke transportation, assistance with the logistics of medical appointments, friendly customized translation assistance, and what amounts to essentially a social event with their compatriots, all travelling together in the Recruitment van.

3.    Defendants only offer these services described above to Government Beneficiaries.

4.    The paid-per-Government-Beneficiary Recruiters arrange appointments for and transport Beneficiaries to one of Defendants' sixteen (16) Atlanta metropolitan-area clinics where Defendants perform cardiac *radionuclide imaging*, commonly referred to as "stress tests," as well as other expensive tests and procedures under the guise of routine preventative medicine, and submit

such false claims for payment for these inducement-tainted, medically

unnecessary services to Medicare and Medicaid, collecting tens of millions of

dollars to which they know they are not entitled.

5.      Medicare pays providers in the Atlanta, Georgia area for cardiac

stress tests using an electrocardiogram ("EKG") and including the "Cadillac" of

stress tests, *Myocardial Perfusion Imaging nuclear stress tests*, at rates ranging from

under $20 to more than $545 per test, respectively.

6.      Nuclear tests can result in additional unnecessary billing to the

Government as well as potential patient harm when used as a routine screening

procedure.

7.      The nuclear stress test at issue in this case, myocardial perfusion

imaging, or "MPI," is known to produce false positives used to justify invasive

subsequent testing that puts patients at risk of side effects including internal

bleeding and/or stroke, resulting in costs on millions to Taxpayers in subsequent

medical procedures necessary only due to the medically unnecessary use of the

test itself.  Salima Qamruddin, False-Positive Stress Echocardiograms: A

Continuing Challenge, 16 The Ochsner J. 277, 277-279 (2016); *see also* Eric Barnes,

Half of positive SPCT patients negative at CCTA, AuntMinnie (April 13, 2015),

https://www.auntminnie.com/index.aspx?sec=log&itemID=110673.

7

8.     Whenever a Government Beneficiary Recruit agrees to and is subjected to such a "stress test," regardless of any clinical indication of medical necessity, **Georgia Clinic** rewards Defendants' Recruiters with an *extra* payment of $50 for "bringing" them the Government Beneficiary and getting the Beneficiary to agree to submit to such a "stress test.".

9.     As more fully described below, **Georgia Clinic** convinced its Recruiters that they were providing a valuable translation service to their own ethnic community in order to enable their elderly compatriots to obtain important Government-provided healthcare to which they were entitled, but would otherwise be denied.

10.     In a separate but related scheme, **Defendant Georgia Clinic** sells Government-Beneficiary prescription referrals to **Defendants Mahesh C. Patel** and **Ganesha RX Care Group 3, LLC d/b/a Georgia Discount Pharmacy**, the on-site, but separately owned pharmacy, in exchange for direct payments and above-market rent, referred to by Defendants as "profit sharing."

11.     In short, these schemes include:

**(1)** presenting false claims for payment for services to patients who are solicited to come to **Georgia Clinic** by Recruiters paid by Georgia Clinic on a per Medicaid and Medicaid Beneficiaries brought in for

8

procedures basis, with extra payment for those Targets induced to undergo nuclear stress testing;

(2) presenting false claims for payment for medically unnecessary diagnostic tests, including myocardial perfusion imaging or "nuclear stress tests;

(3) presenting false claims for payment for services to patients who were solicited with the promise of free transportation in violation of the Beneficiary Inducement Statute;

(4) causing false claims to be presented for payment for outpatient prescription drugs prescribed by Defendant Georgia Clinic and provided and dispensed by Defendant pharmacist Mahesh C. Patel and his Georgia Discount Pharmacy pursuant to an illegal kickback "profit sharing" arrangement for a wide variety of drugs, from heart and blood pressure medications such as atorvastatin calcium, simvastatin, lisinopril, hydrochlorothiazide, and amlodipine prescriptions written primarily by **Defendant Drs. Parikh and Reddy**, to medications for primary care patients who are elderly and/or suffering from chronic diseases such as metformin,

9

omeprazole, Voltaran, amlodipine besylate, and gabapentin written

by primarily **Defendant Dr. Vayner;** and

**(5) on Defendants Mahesh and Georgia Discount Pharmacy's part,**

for participating in such a "profit sharing" arrangement with Georgia

Clinic to dispense drugs to Government Beneficiaries.

## II.    STATEMENT OF THE CASE

12.    This is a *qui tam* action *filed under seal* by Relator Adi Demirovic on

behalf of the United States of America and on behalf of the State of Georgia

(collectively, the "Government")  to recover treble damages and civil penalties

arising from false and/or fraudulent records, statements, and claims made or

caused to be made to the Government by Defendants and/or their agents and

employees in violation of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA")

and the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 to 49-4-

168.6 ("GFMCA").

## III.   <u>PARTIES</u>

### A. Relator

13.     **Relator Adi Demirovic** is an adult citizen of the United States of America and a resident of the State of Georgia, City of Lawrenceville, County of Gwinnett. He worked as a translator and driver for Defendant Georgia Clinic from January 2015 until March 4, 2017.

### B. Government Plaintiffs

14.     **The United States of America** is a sovereign country whose Department of Health and Human Services ("HHS") pays claims submitted or caused to be submitted to it by Defendants through the Medicare program and, as shared with the State of Georgia, the Medicaid program. Relator brings this action on behalf of the United States of America pursuant to 31 U.S.C. §3730(b)(1).

15.     **The State of Georgia**, through its Department of Community Health, pays claims submitted or cause to be submitted to it by Defendants through the state's Medical Assistance program (hereinafter referred to as

"Medicaid"). Relator brings this action on behalf of the state pursuant to, Ga. Code Ann. §§49-4-168 to 49-4-168.6.

### C. Defendants

16.    **Defendant Georgia Clinic, P.C.,** is a Georgia professional corporation with a principal place of business located at 1861 Peeler Road, Dunwoody, Georgia 30338. Its registered agent for service of process in Georgia is Naresh K. Parikh, M.D., who is located at 9210 Prestwick Club, Duluth, Georgia 30097.

17.    **Defendant Naresh K. Parikh, M.D.** is an adult citizen of the United States of America, a resident of the State of Georgia, County of Gwinnett, and a physician licensed to practice medicine in the State of Georgia.

18.    **Defendant Galina Vayner, M.D.** is an adult citizen of the United States of America, a resident of the State of Georgia, City of Sandy Springs, County of Fulton, and a physician licensed to practice medicine in the State of Georgia.

19.    **Defendant Kota R. Reddy, M.D.** is an adult citizen of the United States of America, a resident of the State of Georgia, City of Duluth, County of Gwinnett, and a physician licensed to practice medicine in the State of Georgia.

20.     **Defendant Mahesh C. Patel** is an adult citizen of the United States

of America, residing at 1020 Gallatin Way, Suwanee, Georgia 30034. He is a

pharmacist licensed in the State of Georgia and the managing organizer and

owner of the Defendant pharmacy, Ganesha RX Care Group 3, LLC.

21.     **Defendant Ganesha RX Care Group 3, LLC, d/b/a Georgia**

**Discount Pharmacy,** is a Georgia limited liability company with a principal place

of business located at 2109 Brockett Road, Tucker, Georgia 30084. Its registered

agent for service of process in Georgia is John Ulmer, who is located at 2176

Highpoint Road, Snellville, Georgia 30078. Its managing organizers are

pharmacist Mahesh Patel and Georgia Discount Pharmacy, located at 1861 Peeler

Road, Dunwoody, Georgia 30338.

## IV.     JURISDICTION AND VENUE

22.     Jurisdiction lies in this Court pursuant to 28 U.S.C. §§1331, 1345 and

31 U.S.C. §3732(a), the latter of which specifically confers subject matter

jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §3730.

23.     Jurisdiction over the state law claims is appropriate pursuant to 28

U.S.C. §1367 and 31 U.S.C. §3732(b).

13

24.     The Court may exercise personal jurisdiction over Defendants, and

venue is appropriate in this Court pursuant to 31 U.S.C. §3732(a), which

authorizes nationwide service of process, because Defendants transact business

in the Northern District of Georgia and have caused and continue to cause false

claims to be submitted from this District.

25.     Venue is proper in the Federal District Court, Northern District of

Georgia pursuant to 28 U.S.C. §1391 because the Defendants transact business in

this District and one or more of the acts committed by the Defendants and

proscribed by 31 U.S.C. §3729 occurred in this District.

26.     Specifically, Defendants Georgia Clinic, P.C. and Drs. Parikh,

Vayner, and Reddy operate medical clinics; Defendant Patel operates a

pharmacy located in this District; and Defendant Ganesha RX Care Group 3,

LLC, d/b/a Georgia Discount Pharmacy dispenses medications and submits

false claims within this District, all where they respectively provide services to

Government Beneficiaries who reside in this District.

27.     Relator provided written and oral notification to the United States

Department of Justice at the United States Attorney's Office for the Northern

District of Georgia of his intent to file this action along with a description of the

14

claims and a statement of all material evidence and information related to the Complaint pursuant to 31 U.S.C §3730(b)(2).

## V.    **LEGAL AUTHORITY**

### A. False Claims Act

20.    The False Claims Act ("FCA") was originally enacted during the Civil War. Congress substantially amended the Act in 1986, 2009, and 2010, to enhance the ability of the United States to recover losses it sustained as a result of its payment of false claims.

21.    In 1986 Congressional hearings found that false claims for payment in federal programs was pervasive and that the FCA is a primary tool for combating false claims to the government, whereupon Congress amended the Act with the intention of enhancing incentives for individuals with knowledge of false claims against the Government to disclose the information without fear of reprisals. *See generally, False Claims Act Amendments: Hearings before the Subcomm. of Admin. Law and Gov't Relations of the Comm. on the Judiciary*, 99th Cong. 48 (1986).

22.     The current FCA is designed to encourage the private bar to commit

legal resources to pursuing fraud on the Government's behalf and to create a

private/public partnership to obtain recovery for false claims submitted to the

Government. *See generally, False Claims Act Amendments: Hearings before the*

*Subcomm. of Admin. Law and Gov't Relations of the Comm. on the Judiciary,* 99th

Cong. 48 (1986).

23.     Under 31 U.S.C. §§3729 (b)(1), the "terms 'knowing' and

'knowingly'":

        (A) mean that a person, with respect to information —

                (i) has actual knowledge of the information;

                (ii) acts in deliberate ignorance of the truth or falsity of the

        information; or

                (iii) acts in reckless disregard of the truth or falsity of the

        information; and (B)"require no proof of specific intent to defraud."

24.     The FCA subjects a person to liability under section 31 U.S.C. §§3729

*et seq,* who:

        (A) knowingly presents, or causes to be presented, a false or

fraudulent claim for payment or approval;

16

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), … or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

Any person who violates the FCA *qui tam* provisions is liable for civil penalties for each violation, plus three (3) times the amount of the damages sustained by the United States.  31 U.S.C. §3729(a)(1).

28.     After a catch-up inflation increase, the range of the civil penalties is adjusted for inflation by the annual cost-of-living-adjustment. Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (Section 701 of the Bipartisan Budget Act of 2015, Public Law 114–74). For civil penalties assessed after February 3, 2017, whose associated violations occurred before November 2, 2015, the adjusted civil penalties are between $10,957 and $21,916 per violation, while civil penalties assessed after August 1, 2016, and on or before February 3,

2017, whose associated violations occurred after November 2, 2015, are between $10,781 and $21,563. 28 C.F.R. §85.5Medicare & Other Federal Healthcare Programs

29.     Medicare is a federally funded health insurance program primarily benefitting the elderly. Created in 1965 as part of Title XVIII of the Social Security Act, Medicare has multiple parts.

30.     Medicare Part A, which is not at issue here, is the Basic Plan of hospital insurance and covers the cost of care services provided as part of an inpatient stay in a hospital, hospice, or similar facility.

31.     Medicare Part B, at the heart of this case, is a federally subsidized, voluntary insurance program that pays a portion of the cost of certain medical and other health services not covered by the Part A program, commonly including outpatient Evaluation and Management ("E/M") services, certain diagnostic tests, and other physician services.

32.     Payment for Medicare Part B and Part D claims are made by the United States through its Centers for Medicare and Medicaid Services ("CMS"). CMS contracts with private insurance companies to review, process, and pay appropriate claims for physician services. 42 U.S.C. §1395h and 42 U.S.C. §1395.

18

33.   The Social Security Act governs Medicare payment for all physician services. Section 1833(e) of the Social Security Act further prohibits payment for claims *"unless there has been furnished such information as may be necessary to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period."* 42 U.S.C. §1395l(e).

34.   At all relevant times, **Defendant Drs. Parikh, Vayner,** and **Reddy,** acting for themselves and as agents for **Defendant Georgia Clinic**, signed, or caused to be executed, a **Provider Agreement** with CMS that permits **Naresh Parikh, MD**, through his practice **Defendant Georgia Clinic**, to submit claims and accept payment for services rendered to Medicare beneficiaries.

35.   The said **Provider Agreement** between CMS on the one hand and the Defendant Clinic and its physicians on the other was revalidated on May 1, 2018.

36.   When submitting any claims for payment by CMS, pursuant to the **Provider Agreement,** the Defendant healthcare providers must certify that the information included on the claim forms, described below, presents an accurate description of the medical services rendered and they must further certify that

the services for which they request payment were both "reasonable" *and* "medically necessary."

37. Healthcare providers under the Medicare Part B system submit claims for payment on either paper or electronic claim forms, depending upon the type of provider submitting the claim. Generally, institutional providers submit 837I, or its paper equivalent CMS 1450, also known as UB-04, while claims for the services by individual providers are submitted using 837P version 5010A1, or its paper equivalent CMS-1500, formerly HCFA 1500.

38. These forms, which are a pre-condition to Government payment, describe, among other things, the provider, the patient, the referring physician, the service(s) provided by procedure code, the related diagnosis code(s), the dates of service, and the amount billed.

39. Providers submitting 837I or CMS 1450 certify that the information provided is "true, accurate and complete" and that the specific services billed for on the form are "medically indicated and necessary" for the beneficiary involved. Likewise, providers submitting 837P or CMS 1500 certify that "[s]submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate, and complete."

40.     **Defendants** submit Medicare claims using CMS form 1500 or its electronic equivalent form 4010A1 and are aware of the above required certifications and representations.

41.     Additionally, to participate in the Medicare program, a healthcare provider must enter into a contract with CMS in which the provider agrees to follow all applicable statutory and regulatory provisions relating to Medicare payments and reimbursements. 42 U.S.C. §1395cc. For example, healthcare providers participating in the Medicare program must:

> (a) Refrain from making false statements or misrepresentations of material facts concerning payment requests;
>
> (b) Not bill for any services or products that were not performed or delivered in accordance with all applicable policies;
>
> (c) Be fully licensed and/or certified under all applicable state and federal laws to perform the services provided to the recipients;
>
> (d) Comply with the applicable state and federal statutes, policies and regulations; and
>
> (e) Not engage in any illegal activities related to the furnishing of services or products to recipients.

42 U.S.C. §1395, *et seq.*

21

42.     As a condition of participation in the Medicare Part B program,

providers agree to be familiar with, and abide by, the program's payment

policies. Specifically, **Defendant Georgia Clinic,** in completing the Medicare

Enrollment Application form, made the following Certification Statement:

> (3) *I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. . . . I understand that payment of a claim by Medicare is condition upon the claim and the underlying transaction complying with such laws, regulations and program instructions . . . and on the supplier's compliance with all applicable conditions of participation in Medicare.*
>
> (6) *I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.*

43.     Accordingly, **Defendant Georgia Clinic** has a duty to be fully

knowledgeable of the statutes, regulations, and guidelines regarding coverage

for Medicare services.

44.     Finally, in addition to their enrollment obligations,

Medicare Part B providers must annually execute, or "revalidate" the

Medicare Participating Physician or Supplier Agreement (CMS – 460):

> *The above named person or organization, called "the participant," hereby enters into an agreement with the Medicare program to accept assignment of the Medicare Part B payment for all services for which the participant is eligible to accept assignment under the Medicare law*

22

>    *and regulations and which are furnished while this*
>    *agreement is in effect....*

45.    The Agreement further makes clear that substantial failure to
"comply with the agreement" will cause the Agreement to be terminated and
may result in "[c]ivil and criminal penalties."

### B. The Anti-Kickback Statute

46.    The Medicare and Medicaid Fraud and Abuse Statute, referred to
herein as the "Anti-Kickback Statute," 42 U.S.C. §1320a-7b(b), was enacted under
the Social Security Act in 1977.

47.    The Anti-Kickback Statute arose out of Congressional concern that
payoffs to those who influence healthcare decisions will result in goods and
services being provided that are medically inappropriate, unnecessary, of poor
quality, or even harmful to patients.

48.    The Anti-Kickback Statute prohibits any person or entity from
making or accepting payment to induce or reward any person for referring,
recommending, or arranging for the purchase of any item for which payment
may be made under a federally-funded health care program.  42 U.S.C. §1320a-
7b(b).

49.     The Anti-Kickback Statute ascribes liability to both sides of an impermissible kickback relationship.

50.     To protect the integrity of federal health care programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.  Thus, proof of taint is sufficient, without the need to prove the effect and damages caused by the taint on specific decisions.

51.     Claims for payment for services tainted by kickbacks are false pursuant to the False Claims Act.  42 U.S.C. §1320a-7b(g).

52.     Compliance with the Anti-Kickback Statute is a condition of payment for claims administered by physicians for which Medicare or Medicaid reimbursement is sought. Payment practices under all Government healthcare programs closely align with the rules and regulations governing Medicare payments.

53.     Each of the Government healthcare programs requires every provider who seeks payment from the program to promise and ensure compliance with the provisions of the Anti-Kickback Statute and with other federal laws governing the provision of healthcare services in the United States.

24

54.     As such, if a provider informs CMS or its agent that it provided services in violation of the Anti-Kickback Statute or another relevant law including off label indications, CMS will not pay tainted claims, regardless of whether they are otherwise reasonable or medically necessary and regardless of whether specific actual damages are proven to be caused by the tainted services.

55.     The Patient Protection and Affordable Care Act ("PPACA"), Public Law No. 111-148, Sec. 6402(g), amended the Anti-Kickback Statute or "Social Security Act," 42 U.S.C. §1320a-7b(b), to specifically allow violations of its "anti-kickback" provisions to be enforced under the FCA.

56.     The PPACA also amended the Social Security Act's "intent requirement" to clarify that violations of the Social Security Act's anti-kickback provisions may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation." PPACA, Public Law No. 111-148, Sec. 6402(h).

57.     Violation of the Anti-Kickback Statute subjects the violator to liability for exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation, 42 U.S.C. §1320a-7(b)(7), 1320a-7a(a)(7), in addition to the treble damages and penalties of the False Claims Act.

58.     Compliance with the Anti-Kickback Statute is a precondition to participation as a healthcare provider under the Medicare and Medicaid programs as required by the Provider Agreements set forth in forms CMS-855A and CMS-855I.

59.     Either pursuant to Provider Agreements, claim forms, or in another appropriate manner, hospitals and physicians who participate in a federal healthcare program generally must certify that they have complied with the applicable federal rules and regulations, including the Anti-Kickback Statute, in order to obtain Government payments. 42 C.F.R. §424.510(d)(3).

60.     Any party convicted under the Anti-Kickback Statute must be excluded from federal health care programs for a term of at least five (5) years. 42 U.S.C. §1320a-7(a)(1).

61.     Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the Anti-Kickback Statute, the Secretary may exclude that provider from the federal and related state healthcare programs for a discretionary period and may impose administrative sanctions of $50,000 per kickback violation.  42 U.S.C. §1320a-7(b).

### C. Stark Act

62.     Statute 42 U.S.C. § 1395nn, commonly referred to as "Stark II," and its associated regulations, 42 C.F.R. §350 *et seq.* (collectively, "Stark"), provide that if a physician has a "financial relationship" with an entity, the physician may not make a referral to the entity for the provision of "designated health services," unless the relationship satisfies the requirements of an exception set forth in Stark.

63.     Prior to Stark's passage, studies had shown that when physicians had financial relationships with hospitals, for example, they referred more patients to such hospitals than they otherwise would have absent such financial relationship. 66 Fed. Reg. 856, 859 (Jan 4, 2001).

64.     Stark further provides that an entity may not present or cause to be presented to Medicare a claim for "designated health services" tainted by a prohibited referral. In addition, Medicare is *prohibited* from making payment on any such claim.  Both inpatient and outpatient hospital services are "designated health services" under Stark.

65.     Compliance with Stark is also a material condition of payment of a claim through Medicare, Medicaid, or other Government health plans. The

statute, 42 U.S.C. §1395nn(g)(1), prohibits Government payment for designated health services provided in violation of Stark.

66.     The provisions of Stark have been extended to Medicaid pursuant to 42 U.S.C. §1396b(s).

67.     Thus, a violation of Stark gives rise to False Claims Act liability.

**D. The Beneficiary Inducement Statute**

68.     Operating alongside the Anti-Kickback Statute and Stark Law, which focus on illegal remuneration in exchange for the *referral of Government health program business*, is 42 U.S.C. §1320a-7a, a provision aimed specifically at preventing kickbacks paid *to Government Beneficiaries themselves*, commonly referred to as the **Beneficiary Inducement Statute**.

69.     Under 42 U.S.C. §1320a-7a, "any person or entity" is prohibited from offering or providing "remuneration" to a Medicare Beneficiary.  The purpose of the statute is to prevent such remuneration influencing the Beneficiary to order or receive healthcare from a particular provider.

70.     Under regulations recently clarified and codified in early 2017, "remuneration" specifically includes "free or discounted transportation," absent certain conditions not present in this case:

a. The availability of the free or discounted local transportation services is set forth in a policy, which the eligible entity **applies uniformly and consistently for all patients, not just for Government Beneficiaries;**

b. The availability of the free or discounted local transportation services is not determined in a manner **related to the past or anticipated volume or value of Federal health care program business;**

c. The free or discounted local transportation services are not air, luxury, or ambulance-level transportation;

d. The provider does not publicly **market or advertise** the free or discounted local transportation services, no marketing of health care items and services occurs during the course of the transportation or at any time by drivers who provide the transportation, and drivers or others arranging for the transportation are not paid on a per-beneficiary-transported basis;

e. The free or discounted local transportation services transportation are rendered to established patients of the

29

> provider offering the services, who are located within 25 miles
> of the provider, and who are obtaining medically necessary
> items and services.

42 C.F.R. §1001.952(bb).

71.     As described in detail below, Defendant Georgia Clinic's offer of free transportation services blatantly violates 3 of these 5 regulatory requirements, as the free transportation is (1) not provided "consistently" to all patients pursuant to any written policy, but rather offered solely to Government Beneficiaries in absence of a written policy; (2) offered solely as a way to increase Federal health care program business; and (3) widely and vigorously advertised, including the marketing to Government Beneficiaries *during* the transportation itself in an effort to encourage them to undergo "stress tests."

72.     Like the AKS and Stark, compliance with the Beneficiary Inducement Statute is a condition of payment of Medicaid and Medicare claims because it plays an important role in ensuring that healthcare services are selected and provided according to patients' clinical needs as opposed to being a product of the providers' marketing efforts.

## VI.   FACTUAL BACKGROUND

### A. Relator Adi Demirovic

73.     In September 2011, Relator Adi Demirovic, an American citizen who is Bosnian by nationality, moved to Lawrenceville, Georgia, a city on the outskirts of Atlanta, Georgia with the largest Bosnian population in Georgia, numbering about 20,000, despite the City's relatively small total population. Many members of the Bosnian community do not speak English fluently.

74.     At all relevant times, Relator has been an active participant in the Atlanta-area Bosnian community.

75.     In January 2013, Relator commenced employment with PharmaSouth, a pharmacy in Atlanta, Georgia, as a part-time drug delivery driver on an hourly basis, plus an additional one dollar ($1.00) for every new prescription filled by new patients he directed to PharmaSouth.

76.     PharmaSouth encouraged Relator to use his Bosnian language proficiency and knowledge of the Bosnian community to obtain referrals to the pharmacy for filling of prescription medications and devices. Demirovic did not generally claim the prescription referral bonus payments, but he did become familiar with the concept of ethnically-aligned referrals and the pay-per-referral structure as a healthcare industry norm.

77.     In 2015, after about two years of delivering drugs for PharmaSouth, Relator was approached by Hetel Parmer, **Defendants Georgia Clinic's** administrator for all sixteen (16) Georgia Clinic locations, who told Relator that Dr. Parikh was in need of a "translator" who could also serve as a "driver" for elderly Bosnian patients located in the Lawrenceville, Georgia area. She wanted to know how many "patients" Relator had whom he could deliver to Georgia Clinics.

78.     Thereafter, **Defendant Naresh K. Parikh** interviewed and hired Relator who began to work for **Defendant Georgia Clinic** in the mornings and to continue working for PharmaSouth in the afternoons.  In late 2015 or early 2016, PharmaSouth started doing business as PharmaLife and in February or March 2017, it moved out of its location within Georgia Clinic in Norcross, Georgia upon being purchased by CVS Health Corp.

79.     Relator ceased his employment with Georgia Clinic in May 2017.

### B. Defendant's Organizational & Operational Structure

80.     **Defendant Naresh K. Parikh** incorporated **Defendant Georgia Clinic, P.C.**, in 1999. As its owner, Chief Executive Officer, and Medical Director, **Dr. Parikh** is responsible for making all decisions related to the operation of the

32

clinic, including the hiring and firing of employees, the review and implementation of all policies and procedures related to patient care, and business operations including billing, procedures in the training and supervision of staff, and filing claims for payment by the Government.

81.     Dr. Parikh's wife, Asha Parikh, M.D., also a physician at Georgia Clinic, is the Secretary and Chief Financial Officer for Georgia Clinics.

82.     Dr. Parikh's son, Nirav Parikh, M.D., is also a physician at Georgia Clinic in its Norcross, Georgia location, but has no known position in the company, Georgia Clinic, P.C.

83.     From its headquarters in Norcross, an Atlanta, Georgia suburb, **Defendant Georgia Clinic** has grown rapidly since 1999, and now employs over twenty (20) healthcare providers in a variety of specialties, operating out of sixteen (16) locations throughout the Atlanta metropolitan area.

84.     The **Georgia Clinic** organizes its healthcare operations into five (5) specialty service areas:

> a.  Primary care and OBGYN;
>
> b.  Cardiac Imaging, Testing & Podiatry;
>
> c.  Diagnostic Testing & Radiology;
>
> d.  Sleep Study Center; and

e.  Pharmacy.

85.     While Georgia Clinic, P.C. lists "Pharmacy" on its website as one of its five (5) specialty service areas, it does not clearly state anywhere on its website that the pharmacy operation is a separately owned and operated business apart from Georgia Clinic, P.C., reflecting Georgia Clinic's attempt to conceal the profit-sharing arrangement it has with its on-site pharmacy, as described in further detail below.

86.     **Defendant Georgia Clinic** is a private practice member of the Emory Healthcare Network.

87.     Established in 2011, the Emory Healthcare Network joins together Emory-employed and private practice physicians in communities throughout metropolitan Atlanta and the State of George in collaboration with Emory Healthcare, into a single comprehensive care management system.

88.     **Defendant Naresh Parikh** is Board-certified in Cardiology and Internal Medicine, specializing in geriatric medicine, hypertension, osteoporosis, preventative medicine, and, according to his Emory Healthcare online profile, "stress test."

89.     Originally from India, where he graduated from Government Medical College, **Dr. Parikh** maintains an active cardiology and geriatric

34

medicine practice, providing services out of **Defendant Georgia Clinic's** main

location in Norcross, Georgia, as well as from its locations in Alpharetta, Georgia

and at Georgia Clinic's 1861 Peeler Road, Dunwoody, Georgia site.  He has

admitting privileges at multiple hospitals, including Emory Johns Creek Hospital

and Emory St. Joseph's Hospital.

90.     Working closely alongside **Defendant Parikh** as the two most

prolific healthcare providers at **Georgia Clinic** are **Defendant Drs. Galina**

**Vayner** and **Kota Reddy**, both of whom are also located in **Defendant Georgia**

**Clinic's** main Norcross, Georgia location.

91.     **Defendant Galina Vayner, M.D.** practices Internal Medicine. In

addition to providing more manual physical therapy (CPT code 97140) than

nearly any other Internal Medicine practitioner in the state of Georgia, **Dr.**

**Vayner** provides a wide variety of outpatient care and regularly refers patients

to **Dr. Parikh, Dr. Reddy**, and other **Georgia Clinic** providers for cardiac testing

and other services.

92.     **Defendant Vayner** is no stranger to false claims. She joined

**Defendant Georgia Clinic** around 2012, shortly after the clinic she previously

practiced with, Atlanta Institute of Medicine and Rehabilitation ("AIMR"), was

shut down and its owner, Lawrence Eppelbaum, imprisoned following a jury

verdict finding Eppelbaum guilty of committing healthcare fraud by inducing patients to come to his clinic for various medically unnecessary tests.

93.     **Defendant Kota Reddy, M.D.** practices Cardiology, specializing in the type of cardiac nucleotide imaging at issue in this case. In 2016, **Dr. Reddy** billed the Government for more cardiac nucleotide imaging than over 97% of Georgia cardiologists and over 96% of all providers nationwide who submit claims to the Government for **CPT code 78452**, regardless of specialty, collecting millions of dollars in payments from Medicare and Medicaid.

94.     Claims submitted for payment for services provided at **Defendant Georgia Clinic**, are sent under individual providers' names with their respective National Provider Identification ("NPI") number, not collectively under the Georgia Clinic.

## VII.   DEFENDANTS' CONDUCT

### A. The Recruitment Scheme

95.     Since at least 2013 and likely well before that, **Defendant Georgia Clinic** has regularly employed several Recruiters, currently at least seven (7) of them, *hired due to their nationality, their native tongue, and their acquaintance within*

36

*their respective ethnic community,* to target Medicare/Medicaid Beneficiaries of their respective ethnic communities.

96.     Defendants train each of their Recruiters to round up Medicare /Medicaid Beneficiary Targets of their own nationality and transport them into one of the Georgia Clinics locations.

97.     **Defendant Georgia Clinic** pays its Recruiters hourly on an independent contractor basis for driving and translating and, in addition, Georgia Clinic pays a per capita bonus to Recruiters for each Government Beneficiary brought into the clinics: $15-20 per Government Beneficiary and an additional $50 per Government Beneficiary who agrees to and does undergo a "stress test."

98.     Each of these several Recruiters brings in at least 40-50 Government Beneficiaries annually for stress tests as well as scores more who receive other types of health services for which the Government is billed when Defendants submit their corresponding false claims.

99.     When Relator was hired by **Defendant Georgia Clinic** in January 2015, **Defendant Georgia Clinic** paid him $20 hourly to transport patients to their appointments at Georgia Clinic and provide translation services; a bonus of

$15-$20 per Government Beneficiary recruited, and an extra $50 bonus for each Government Beneficiary who agreed to and did undergo "a stress test."

100.   Georgia Clinic directed Relator that his first task was to quickly begin developing "leads," by:

        a. reaching out to friends and acquaintances in the Bosnian community directly and via social media such as Facebook;

        b. posting and/or distributing flyers advertising Georgia Clinic in high-traffic areas in the Bosnian neighborhood of Lawrenceville including the Bosnian Community Center, popular stores frequented by Bosnians, and at least one Assisted Living Facility that was located in Sandy Springs, Georgia; and

        c. reviewing a list of former AIMR patients provided to him by Jessica, the receptionist at Georgia Clinic's "Sugar Loaf" location at 33 Peachtree Industrial Boulevard, Sugar Hill, Georgia 30518, to identify Bosnians and calling them to talk them into using healthcare services from Georgia Clinics.

101.   Within 6 to 8 weeks of this opening round of recruitment efforts, Relator began providing a steady stream of Recruits, referring dozens of new

patients to Georgia Clinic within the first year of his employment, at least twenty (20) to thirty (30) of whom underwent stress tests between early 2015 and mid-2016.

102.   **Defendant Georgia Clinic** also employed several other Recruiters in addition to Relator, specifically including, but not limited to, Trisha Magar, Lila Dahal, Narapathi Rizal, Amar (last name currently unknown), Hanah (last name currently unknown), and Prithie (last name currently unknown).

103.   As with Relator, these Recruiters were likewise hired by **Defendant Dr. Parikh** because of their ties to particular ethnic communities, including Indian, Nepalese, and Chinese communities, and **compensated on a per-Government-Beneficiary recruitment basis** and an additional $50 bonus for each Government-Beneficiary willing to undergo a "stress test," all in addition to the hourly pay.

104.   When Relator started working as a Georgia Clinic Recruiter in 2015, his own English was still mediocre, and he expressed reservations to Dr. Parikh regarding his ability to effectively translate for his Recruits, particularly due to medical vocabulary with which he was not familiar.

105.   Dr. Parikh dismissed Relator's concerns about his English fluency, telling Relator that it "wouldn't matter" and that it would "be ok" that he was

not fluent in English, after emphasizing that the expectation was that he would be able to recruit patients simply by sharing their Bosnian nationality and that communication on the medical treatment was less significant and not an important part of his duties.

106.    Over the course of his employment, Relator eventually began to learn and understand Defendant's schemes to submit false claims to the Government for payment. In early 2017, Relator began asking Dr. Parikh and office staff questions about whether he had the proper insurance or licensure to operate as a transportation provider.

107.    Shortly thereafter, in or about May 2017, **Defendant Georgia Clinic**'s office worker "Ish" informed Relator that **Defendant Parikh** had directed her to inform Relator that he was "no longer welcome" at Georgia Clinic and that there was no longer "any work" for him.

108.    Relator eventually learned that the pay-per-Government-Beneficiary pay structure constituted illegal kickbacks for referrals and that Defendants were, directly and/or through **Defendants Galina Vayner, M.D.** and **Kota Reddy, M.D.** and/or other **Georgia Clinic** providers, involved in two related, overlapping schemes intended to bilk the Government healthcare plans by submitting false claims for diagnostic cardiology services rendered to

40

Government Beneficiaries who **(1)** did not exhibit the medical indications necessary for services eligible for Medicare or Medicaid payment of such services; and **(2)** were illegally induced to seek care at **Defendant Georgia Clinic**, as introduced above and described in detail below.

### B. Defendants' Use of "Recruiters" to Target Medicare and Medicaid Patients

109.   In January 2015, while Relator was working as a delivery driver for PharmaLife pharmacy, **Defendant Georgia Clinic's** office administrator, Hetel Parmer ("Parmer"), approached Relator in the hallway of Georgia Clinic's Norcross, Georgia headquarters and asked him "*how many patients do you have*?" Unsure of her meaning, Relator sought clarification. Parmer explained that she was referencing the Bosnian patients whose medicine Relator delivered to their homes personally for PharmaLife pharmacy. "*Come tomorrow to meet Dr. Parikh*," she directed.

110.   The following day in January 2015, Relator met with **Defendant Dr. Parikh** and Parmer in Dr. Parikh's Norcross, Georgia office. At the meeting, Dr. Parikh told Relator that he would pay Relator twenty dollars ($20) per hour, plus reimbursement for his gas, to use his own car and act as a driver and translator

41

for patients. Defendant Parikh also stated that Georgia Clinic would pay an additional fifteen to twenty dollars ($15-$20) per referral *"If you start bringing patients to me."*

111.    Within just a week or two of starting to work for **Defendant Georgia Clinic**, Relator recruited a patient who had private insurance. Shortly after that patient's first visit, **Defendant Parikh** pulled Relator aside and stated, *"I cannot pay you for the regular insurance."* **Defendant Dr. Parikh** then explained that the Targets of Relator's recruiting and marketing efforts must be "elderly" people who are on Medicare or Medicaid.

112.    **Defendant Dr. Parikh** directed Relator to create a flyer in the Bosnian language, originally created in English by Parmer, to include a list of all Georgia Clinic locations, an offer of "FREE medical transportation services," and Relator's name, personal cell phone number, and personal email address.

113.    **Defendant Dr. Parikh** then directed Relator,  through Parmer, to help distribute these flyers at a "marketing event" inside The Mansions at Sandy Springs, a 130-bed assisted living facility located at 3175 River Exchange Drive, Peachtree Corners, Georgia, where Georgia Clinic set up a booth with stacks of Relator's flyers prominently displayed as shown below:

42



114.   In February 2015, **Defendant Dr. Parikh** directed Relator to send out the following message, via his personal Facebook page and his personal text message, to as many of his Bosnian contacts whom he believed were elderly or had elderly family members:

> *"Georgia Clinic/Pharmalife nudi usluge besplatnog prevoza pacijenata od njihove lokacije do klinike i nazad. Nudimo i Besplatnu dostavu lijekova na kucnu ili poslovnu adresu. Ovaj servis je organizovan kako bi se pomoglo ljudima koji ne pricaju*

43

*dobro Engleski jezki i imaju poteskoca sa sporazumjevanjuem prilikom posjete ljekaru. Isto tako za sva pitanja oko lijekova ili bilo cega drugog, mozete se konsultovati se farmaceutom na nasem jeziku. Prevoz je obezbjedjen za ljude koje nisu u mogucnosti sami doci do doktora, kao i prevodjenje tokom posjete doktoru. Sve to kao i dostava lijekova obezbjedjeno je od strane Georgija Clinic ....Za sve informacije mozete nazvati broj telephona 678-790-2748...."*

Translated from Bosnia, the message reads:

"Georgia Clinic/PharmaLife offers free transportation of patients from their location to the clinic and back. We also offer free delivery of medications to your home or business address. This service is organized to help people who do not speak English well and have difficulty communicating when visiting a doctor. Also, for any questions about medicines or anything else, you can consult a pharmacist in our language. Transportation is provided for people who are not able to come to the doctor on their own, as well as the translation during the visit to the doctor. All of

44

this, as well as the delivery of medicines, is provided by
Georgia Clinic…For all information you can call the
telephone number 678-790-2748….”

115.   In addition to the above marketing and recruitment efforts, on two
occasions in 2015, shortly after Relator started working as a Recruiter for
Defendant Georgia Clinic, Dr. Parikh, through administrative assistants as
described below, directed Relator to review lists of former patients to see if he
recognized any Bosnian patient names, and to then recruit all such Bosnian
former patients to return to Georgia Clinic for services now that a fellow Bosnian
could vouch for the clinic, translate, and provide free transportation.  Under the
arrangement, Georgia Clinic would pay Relator for each Government Beneficiary
on the list he was able to bring in to the clinic.

116.   First, in 2015, former office manager for **Defendant Dr. Galina
Vayner**, “Anna,” directed Relator to go into the back of **Defendant Dr. Vayner's**
office to retrieve and review a password-protected list of patients Dr. Vayner had
treated during the time she was affiliated with the ill-fated Atlanta Institute of
Medicine and Rehabilitation (“AIMR”), along with their contact information.
Relator was also required to attempt to “convince” all Bosnian patients on this

list to come to Georgia Clinic for services now that a fellow Bosnian could vouch for the clinic, translate, and provide free transportation.

117.   Around the same time in 2015, Relator was directed by "Jessica," the office manager of Georgia Clinic's "Sugar Loaf" location in Suwanee, Georgia, about thirty minutes northwest of Atlanta, to review a similar list of former patients to pick out and recruit any Bosnians on that list.

118.   For all these lists of patients, agents of **Defendant Georgia Clinic** directed Relator to review the lists for Bosnians and then further directed him to cold-call the identified Bosnians in order to attempt to obtain referrals for which he would be paid once he brought them into the clinic.

119.   It is Relator's informed understanding and belief that the other Recruiters were similarly ordered to review such lists to identify former patients with the same national origin as those Recruiters.

120.   By mid-2015, Relator's marketing efforts were bearing fruits, or Recruits, and he was fielding multiple calls daily on his personal cell phone from Bosnians asking, "**Are you the guy who's driving people to the doctor?**"

121.   Upon receiving such calls, Relator would follow a general script, or "**sales pitch,**" provided to him by Dr. Parikh during a meeting within the first few weeks of his employment.

46

122. First, Relator and other Recruiters were directed to and did confirm their identity as a Georgia Clinic driver and translator, then speak highly of Dr. Parikh's credentials as a cardiologist as well as the high quality, professionalism, and kindness of the rest of Georgia Clinic's providers, telling prospective patients "*they're really nice*" and "*they'll take care of you.*"

123. Second, when the Government Beneficiary confirmed that he or she would be willing to schedule an appointment, it was the Recruiter's job to obtain the Government Beneficiary Recruit's name, date of birth, address, and phone number and ask them to provide the reason for the visit, particularly any symptoms.

124. Third, the Recruiters then obtained a range of preferred dates for an appointment from the Government Beneficiary and would call the front desk of Georgia Clinic's main office in Norcross, Georgia, and relay the information to a receptionist, who would then schedule the patient with either **Defendant Dr. Parikh** or **Defendant Dr. Vayner**.

125. As described below, while most of Relator's Recruits were originally scheduled with Dr. Parikh, who regularly reminded Relator "I'm Primary Care too!" referring to the fact that he is board-certified in Internal Medicine and thus

could provide primary care services in addition to cardiology, by mid-2016 most of Relator's Recruits became primary care patients of **Defendant Dr. Vayner.**

126.   Relator had very little difficulty turning the patient leads he selected from **Defendant Georgia Clinic's** lists, described above, into Recruits. The Government Beneficiaries he brought in to **Defendant Georgia Clinic** not only found his ability to speak Bosnian comforting and helpful, despite his lack of complete fluency in English or knowledge of medical terms, but the especially trusted Relator implicitly as a fellow Bosnian.

127.   Based on Relator's informed understanding, the several other ethnically-aligned Recruiters engaged by **Defendant Georgia Clinic** had similar success turning their patient leads from Georgia Clinic, as well as others in the Bosnian community, into Recruits and transporting them into the clinics for healthcare services.  They too were compensated on a per Government Beneficiary basis and for the stress test procedure.

128.   For his part, Relator at the time had no reason to believe that his Recruits' trust was misplaced and he reasonably believed, in reliance on express and implied representations made by **Georgia Clinic** and **Dr. Parikh** during the hiring process and throughout his employment, that the services he was

providing were not only *legal* but indeed *essential* to ensuring that the elderly members of his ethnic community had access to healthcare.

129.    Because Georgia Clinic engages their Recruiters as independent contractors and pays them for their Recruitment success, with per-referral payments "in a manner that takes into account the volume or value of any referrals," the Recruiter arrangements fit neither the "**personal services**" contract exception under 42 C.F.R. §1001.952(d), nor the "**bona fide employee**" exception under 42 F.R. §1001.952(i) of the Anti-Kickback statute.

130.    **Defendant Georgia Clinic** provides its Recruiters access to its electronic medical record ("EMR") software, *Parallel*, and directs them to review patient information in order to confirm if and when their respective Government-Beneficiary Recruits actually came in and received services, as well as to help Recruiters keep track of their Recruits' schedule and treatment.

131.    Defendant Georgia Clinic's practice of allowing and providing EMR access to Recruiters, intended to streamline the Recruiting and pay-per-referral process, is also a blatant violation of both the Privacy and Security rules governing the maintenance and disclosure of protected patient health information ("PHI") under the Health Insurance Portability and Accountability Act of 1996 (HIPAA). 45 C.F.R. §§164.306 and 164.502(a).

49

132.    The total amount due to the Georgia Clinic Recruiters, including the hourly pay, the gas reimbursement, the per Government Beneficiary recruitment bonus, and the $50 bonus per Government Beneficiary who underwent a stress test, was then added by its agent, Parmer, and the aggregate paid to the Recruiter in a bi-weekly check on an independent contractor basis.

133.    In most cases, the Recruiters not only recruited these Government Beneficiaries, but also provided them with free transportation to and from their appointments conveniently from their place of residence, translated for them before, during, and after their appointments, and delivered their medications from the "profit-sharing" on-site pharmacy directly to their homes.

134.    A sample list of Medicare Beneficiaries who received primary care *and* diagnostic imaging services rendered by **Defendant Georgia Clinic** and paid for by Medicare and/or Medicaid, during the period between December 2015 and March 2016, after being recruited by Relator pursuant to Relator's **cash-for-referral** arrangement with Georgia Clinics, include the following:

1.) H.Z, 2.) R.Z., 3) M.Y., 4) R.T., 5) H.S., 6) Z.S., 7) M.S., 8) H.S., 9) H.K., 10) D.K., 11) D.I., 12) S.F., 13) N.B., 14) M.B., 15) S.A., 16) D.A., and 17) K.A.

135.    Just as the above Beneficiaries were recruited by Relator as a result of his ability to speak Bosnian and his knowledge of and connection with the

Bosnian community, the following Government Beneficiaries also received

primary care *and* diagnostic testing services during the same period upon

recruitment by Lila Dahal, another of **Defendant Georgia Clinic's** Recruiters,

who is fluent in Hindi and accordingly was directed by **Defendant Dr. Parikh** to

focus his recruitment efforts on the east Indian Government Beneficiary

population:

      1) D.K., 2) T.G., 3) D.R., 4) M.C., 5) G.G., 6) P.N., 7) P.R., 8) J.R., and 9) D.C.

136.    Based on his experience and observations during his time as a

Recruiter for Defendant Georgia Clinic, Relator estimates when combining the

total Government Beneficiaries recruited to Georgia Clinic by Relator and all

other of the several Recruiters, that **Defendant Georgia Clinic**'s payment of per-

patient and procedure kickbacks to bilingual Recruiters and provision of free

transportation, led to the rendering of healthcare services to at the very least

about 150 Medicare and/or Medicaid Beneficiaries per year.


## C. Defendants' False Claims for Medically Unnecessary Stress Tests

137.    **Defendant Georgia Clinic** and its affiliated providers, including

**Defendant Drs. Parikh**, **Vayner**, and **Reddy**, contracted with the Government to

be Medicare and Medicaid providers and accordingly agreed, when they signed their respective **Provider Agreements** and **when they submit each individual claim for payment,** to only submit claims for services that are both "reasonable" and "medically necessary."

138.    The United States Department of Health and Human Services has formally promulgated regulations, specifically 45 C.F.R. §162.1002(a)(5) and (b)(1), that designate the American Medical Association's Current Procedural Terminology ("CPT") and the Centers for Medicare & Medicaid Services ("CMS") Healthcare Common Procedure Coding System ("HCPCS") as the standard codes to be used for physicians and other health care services for purposes of requesting payment from the Government.

139.    Whether Medicare or Medicaid will pay for a service depends on the "indications," matched with each CPT code and listed in National and Local "Coverage Determinations," "NCDs" and "LCDs," respectfully.

140.    The payment amount for each CPT code is determined by the Medicare/Medicaid Physician Fee Schedule.

141.    The primary **cardiac nucleotide testing procedure** provided indiscriminately to the above-listed patients and hundreds of other Government Beneficiaries recruited and usually also transported to **Defendant Georgia Clinic**

52

by their several Recruiters, is **myocardial perfusion imaging, CPT code 78452** for which Medicare and Medicaid pays Atlanta, Georgia area physicians approximately $545 per procedure.

142.    In addition, if the test is a positive, including a common "false positive" there will be follow-up services and may be medical services required if there are complications, all at the Taxpayers' expense.

143.    Also referred to as a "**nuclear stress test**," Myocardial Perfusion Imaging ("MPI") involves a non-invasive test that shows how well blood perfuses and identifies areas of the heart muscle that are not receiving sufficient blood flow.

144.    This stress test has two parts: the stress and the test and each part has the potential to harm the patient and, in the case of a Government Beneficiary in ways that would lead to additional cost to the Taxpayers through additional subsequent Medicare/Medicaid billing.

145.    While the actual imaging portion of the procedure may only take about fifteen (15) minutes to complete, depending on the patient, the entire testing process, which includes a test of the heart under induced stress followed by a waiting period and second test of the heart at rest, can take approximately one (1) to two (2) hours.

146.    When performed on patients who are too elderly or ill to engage in physical exercise as is the case with many Government Beneficiaries, in order to increase stress on the heart, or blood flow, MPI involves the **use of radioactive tracers**, which are injected, mixed with the patient's blood, and taken up by their heart muscle as the blood flows through their arteries. Images of the heart are then taken using Single Photon Emission Computed Tomography ("SPECT") or Positron Emission Tomography ("PET").

147.    Although the amount of radiation to which patients are exposed via the tracer is minimal, the use of MPI is controversial, both because of the cost of the procedures and the fact that less expensive tests have been shown to produce fewer false positives.

148.    False positive test outcomes, not infrequent with MPIs, generally lead to the far more invasive and far more expensive cardiac catheterization, which carries significant risks of internal bleeding, heart attack, and stroke. Ladapo *et. al, Physician Decision-Making and Trends In Use Of Cardiac Stress Testing To Diagnose Coronary Heart Disease In The United States, 1993–2010,* ANNALS OF INTERNAL MEDICINE 161.7 (2014): 482–490

149.    Thus, when administering unreasonable or medically unnecessary **myocardial perfusion imaging ("MPI")**, a provider, such as **Defendant Georgia**

54

**Clinic**, is not only bilking the Taxpayers out of large sums of money for that particular test, but also risking millions of additional tax dollars when false positive test results compel a more invasive test that leads, if patient harm complications materialize, to the public paying to treat internal bleeding, heart attacks, or strokes.

150. Due to the cost and potential harm, CMS limits the situations in which healthcare providers may conduct **myocardial perfusion imaging ("MPI")** on the vulnerable elderly population that comprises the Government Beneficiaries population and to seek payment therefore.

151. Whether Medicare will pay for **myocardial perfusion imaging** must be determined based upon the patient's individual medical condition. The Government does not pay for such testing unless the Government Beneficiary exhibits *at least one* of the set of indications listed in LCD 33457:

  a. Acute myocardial infarction (heart attack);

  b. Unstable angina;

  c. Chronic ischemic (coronary artery) heart disease;

  d. Congenital heart disease and diagnosis of anomalies of the coronary; circulation or Kawasaki's Disease; and/or

  e. Post-transplant heart disease.

55

152.    Thus, as illustrated by the LCDs, it is impossible for a physician to determine the appropriateness of **myocardial perfusion imaging** that is eligible to be billed to the Government, without first examining the patient and reviewing his or her medical history to specifically determine whether *at least one* of the above required indications are present.

153.    Yet, Defendant Georgia Clinic focuses on the Government payment, not on the Beneficiaries individual medical situation.

154.    Georgia Clinic sends out their Recruiters, who think they are helping their elderly (Medicare) or disadvantaged (Medicaid) compatriots obtain access to healthcare, to identify and recruit Government Beneficiaries. Then Defendant Georgia Clinic conducts an MPI on 100% of those patients who have been induced to submit to such testing, without regard to and without knowledge of whether they meet any of the required indicia for the test.

155.    Indeed, **Defendant Georgia Clinic** provides their Recruiters with blank "**Georgia Clinic Outpatient Order Forms**," with verbal instructions to the Recruiters to "circle the stress test," thus making clear that **Defendant Georgia Clinic** is eschewing clinical judgment altogether and is focused solely on obtaining maximum Government payments with total disregard for either reasonableness or medical necessity, as more fully explained below.

56

156.   When Government Beneficiaries arrive at a Georgia Clinic site, the paid Recruiters escort them to Dr. Parikh's office, where he has a brief conversation with the Beneficiary, never more than five minutes, in Relator's personal experience.

157.   As witnessed by Relator many times while he was present and translating, **Dr. Parikh** conducts no preliminary tests and takes no medical history, but merely asks the recruited Government Beneficiary if he or she has **chest pain, high blood pressure, dizziness,** or **shortness of breath, none of which are Government-payable criteria pursuant to LCD 33457 set out above.**

158.   When a Beneficiary denies any such symptoms, Dr. Parikh then presses them though the Recruiter translator by asking, "Are you sure?" Relator has personally observed on multiple occasions that Dr. Parikh will then continue until he eventually succeeds in coaxing the Government Beneficiary to respond affirmatively to at least one of the questions, such as about possible "dizziness." Eventually, the Beneficiary will want to move on and will usually reply, "Maybe sometimes," or something to that effect.  When the Beneficiary relents, Relator has observed that Dr. Parikh then records an unqualified affirmative response in the medical record for that Government Beneficiary and promptly conducts a "stress test" which he bills to the Government.

159.    In Relator's personal experience, one way or the other, Dr. Parikh will administer the MPI to 100% of the Government Beneficiaries whom the Recruiter brought in for a "stress test" and for which the Recruiter is paid $50.

160.    In early 2016, Relator was in the Norcross, Georgia Clinic facility after having delivered Government Beneficiary Recruit, H.M., when Dr. Parikh saw Relator in the hallway. When **Defendant Parikh** learned that H.M. was a fresh Government Beneficiary Recruit, Dr. Parikh's first and only response was to insist that Relator "bring [H.M.] to [him] for a stress test," despite the fact that Dr. Parikh had not so much as spoken to H.M., or reviewed any of H.M.'s medical records, or even knew H.M.'s name.

161.    Based on Relator's personal observation of these at most 5-minute "assessments," all Government Beneficiaries who are prodded to answer "Yes" to either **chest pain**, **high blood pressure**, **dizziness,** or **shortness of breath,** eventually do concede something to the effect of, **"Maybe sometimes"** and all such Government Beneficiaries then undergo an MPI stress test, for which the Government is billed.

162.    When **Defendant Dr. Parikh** initially discussed the $50 payment for inducing Government Beneficiaries to undergo a stress test, Dr. Parikh directed

Relator to ask them if they *ever* had "chest pain," any "shortness of breath," or any "dizziness" and that he should work those phrases into his sales pitch.

163.   Within a month or two of starting to work for Georgia Clinic, Relator spoke with Administrator Parmer about Dr. Parikh's "business reason" for offering him a $50 bonus for each patient he "brought in" who had ordered a "stress test." In response, Parmer explained that these tests were extremely expensive, "over $1,000 in some cases," she said, adding that Medicare and Medicaid accordingly pay more for them than other types of tests, and they are thus preferred by the Georgia Clinic.

164.   In mid-to-late 2015 and periodically thereafter, Relator observed a whiteboard in **Defendant Parikh's** office that kept a tally of the day's "stress tests." Based on Relator's observation, Dr. Parikh conducted at least five (5) "stress tests" each day.

165.   Relator estimates that of the new patient Government Beneficiaries whom he recruited and transported for free, about 85% underwent a cardiac "stress test."

166.   As Relator developed relationships with his Government Beneficiary Recruits, many of them would share the results of their "stress test" with him. All, exactly 100%, of these Government Beneficiary Recruits who reported their

results to Relator, stated that their "stress test" revealed nothing out of the ordinary.

167.    On a few occasions when Dr. Parikh was unavailable, Relator brought his Government Beneficiary Recruits to geriatric specialist, Sima Dehghany, M.D., who was also employed by Defendant Georgia Clinic at the Norcross location.

168.    However, after a short time, Dr. Dehghany's front office staff told Relator that Dr. Dehghany had instructed them to tell him not to bring his Government Beneficiary Recruits to her anymore.

169.    Dr. Dehghany left **Defendant Georgia Clinic's** practice shortly thereafter.

170.    Relator began to be concerned about whether the medical care provided by Georgia Clinic was reasonable or medically necessary.  Eventually, Relator stopped asking potential patients about stress tests, and limited his duties solely to transportation services for existing patients. His employment with Georgia Clinic ended altogether in March 2017.

171.    Specific examples of Medicare and/or Medicaid Beneficiaries whom Relator personally observed receiving nuclear stress tests from Dr. Parikh

between mid-to-late 2015 and early 2016, include the following Georgia Clinic patients identified by their initials:

1) H.D., 2) S.B., 3) M.R., 4) N.O., 5) H.M., and 6) S.N.

172. The nuclear stress tests were not the only unreasonable or medically unnecessary services **Georgia Clinic** and its **Co-Defendant Physicians** rendered to illegally referred and induced Government Beneficiaries. Indeed, *Defendants directed Recruiters to induce Government Beneficiaries to consent to as many treatments and procedures as possible.*

173. Compounding this kickback scheme is the fact that in many cases Georgia Clinic would then subject these patients to the most lucrative type of MPI stress tests: single and multi-study heart imaging procedures. These tests require that the patient is injected with radionuclide thallium, using a single photon emission computed tomographic ("SPECT") scanner. Such tests are billed under CPT Codes 78451 and 78452.

174. The **Georgia Clinic Outpatient Order Forms** contain many, many options for procedures to "order," including but not limited to several other types of diagnostic imaging, such as cardiac ultrasounds, CPT 93307. Relator has not witnessed Georgia Clinic foregoing any "ordered" treatments, regardless of whether the "ordered" treatment is reasonable or medically necessary, or even

61

that Georgia Clinic actually makes any effort to determine if any "ordered"

treatment is medically necessary at all.

### D. Free Personalized Transportation and Other Services and Payments to Obtain Government Healthcare Business

175.    In case the familiarity of a fellow compatriot providing translation

services, albeit by non-certified translators, and guiding Government

Beneficiaries through their clinic services was not enough to induce Government

Beneficiaries to come to Georgia Clinic for healthcare services, Defendant added

individualized "free transportation" to the inducement.

176.    While HHS has formally promulgated regulations, set forth above,

aimed at allowing the provision of free transportation in certain limited

circumstances, none of those circumstances exist here.  Defendant Georgia

Clinic's free transportation falls far short of the safe harbor rule's requirements

and is easily distinguished as precisely the type of brazen consideration the

Beneficiary Inducement Statute is intended to curb in order to prevent

overutilization of Government-funded healthcare services.

177.    Indeed, in addition to not being provided pursuant to any written,

consistently applied policy and being expressly marketed using flyers, Facebook

posts, and phone text messages advertising "free medical transportation," the

transportation services provided by **Defendant Georgia Clinic** were expressly tied to the "anticipated volume or value of Federal health care program business" in direct violation of the law. 42 C.F.R. §1001.952(bb)(1)(iii).

178.    From the beginning of his employment, as detailed above, Relator was instructed by **Defendant Dr. Parikh** that the exclusive Targets of his marketing efforts, which featured the offer of "free medical transportation," were to be only Medicare and Medicaid Beneficiaries. Georgia Clinic does not offer such services to non-Beneficiaries.

179.    Beneficiaries who routinely received free personalized transportation services from **Defendant Georgia Clinic** as rendered personally by Relator for Georgia Clinic, include the following recruited patients, identified by their initials:

1) H.Z., 2) R.Z., 3) M.Y., 4) R.T., 5) H.S., 6) Z.S., 7) M.S., 8) H.S., 9) H.K., 10) D.K., 11) D.I., 12) S.F., 13) N.B., 14) M.B., 15) S.A., 16) D.A., and 17) K.A.

180.    By mid-to-late 2016, Relator was regularly driving van loads of four to five Government Beneficiaries at a time to and from appointments at Georgia Clinic locations across the metro Atlanta area.

181.    Shortly after Relator began questioning Dr. Parikh about the arrangement in May 2017, Defendant Georgia Clinic terminated him.

**E. Georgia Clinic's Sale of Referrals to Defendant Pharmacist and Pharmacy**

182.   As described above, in January or February of 2017, the other entity for which Relator provided transportation/delivery services, PharmaSouth, which by then had changed its name to PharmaLife, closed its onsite pharmacy at Defendant Georgia Clinic as it prepared to be purchased by CVS.

183.   Faced with losing part of his income, Relator asked Defendant Parikh if he knew any other pharmacies in need of an experienced driver, and Dr. Parikh referred him to April Hang, a pharmacist and entrepreneur operating Peachtree Pharmacy in Atlanta, Georgia.

184.   Relator was offered and accepted a part-time delivery driving position with Peachtree Pharmacy, where he has continued working to the present.

185.   In January 2018, Relator learned from Pharmacy owner Hang that Defendant Parikh had demanded a "cut of the profits" from the prescriptions of patients he had been referring to her. Dr. Parikh referred to the arrangement as "profit sharing."

186.   Peachtree Pharmacy owner Hang explained that she had had several discussions about opening an onsite pharmacy in Defendant Georgia Clinic's

64

Norcross office to replace PharmaLife, but that Defendant Parikh's demands of 50% of the profits from his referrals plus over-market rent of $10,000 per month, constituted a kickback for referrals so she was compelled to cut off negotiations.

187.    On information and belief, **Defendant Georgia Clinic** then made the same or substantially similar "profit-sharing" offer to Defendant Parikh's cousin and pharmacist, **Defendant Mahesh C. Patel**, and his company, **Defendant Ganesha RX Care Group 3, LLC d/b/a Georgia Discount Pharmacy,** which began onsite pharmacy operations on or about December 13, 2017 in the Georgia Clinic's Norcross building.

188.    Hang was right to turn down Dr. Parikh. His proposed arrangement, which included no indication that terms related to a "collaborative agreement", "medical directorship," or any other potentially compliant physician-pharmacy arrangement forthcoming, was a blatant violation of both the AKS and Stark insofar as the terms were clear: cash for referrals, no strings attached.

189.    On information and Relator's informed belief, Defendants Parikh and Patel are currently engaged in an illegal kickback-for-referral arrangement.

190.    Prior to the collapse of his attempts to enter into an illicit kickback relationship with Peachtree Pharmacy and Hang, Defendant Dr. Parikh had

caused thousands of prescriptions written for Defendant Georgia Clinic's patients, including Government Beneficiaries, to be filled at Peachtree Pharmacy, in an apparent effort to show Hang just how lucrative Dr. Parikh's proposed arrangement could be for her pharmacy.

191.    Until Dr. Parikh's negotiations with Hang ended and Dr. Parikh instead contracted with his cousin in late 2017, Relator delivered prescriptions for medications prescribed by providers at Georgia Clinic and dispensed by Peachtree Pharmacy to Government Beneficiaries and other patients.

192.    But after **Defendant Patel's Georgia Discount Pharmacy** moved into Georgia Clinic's Norcross facility under the "profit-sharing" arrangement, Georgia Clinic redirected its patients' prescriptions from Peachtree Pharmacy to Georgia Discount Pharmacy.

193.    Specific examples of Government Beneficiaries whose prescriptions were being filled by Peachtree but are now being filled by Defendants Patel and Georgia Discount Pharmacy pursuant to the illicit "profit-sharing" arrangement Hang declined, include the following patients, identified by their initials:

> a.  Medicaid Beneficiary R.C., prescribed Voltaren, a steroidal, anti-inflammatory pain medication by Defendant Dr. Galina Vayner, as of May 2017;

66

b. Medicare Beneficiary D.K., prescribed 40mg pantoprazole, a proton pump inhibitor, by Defendant Dr. Galina Vayner as of March 9, 2017

c. Medicare Beneficiary H.K.,  prescribed 10mg Ambien, a controlled substance and sleep aid, by Defendant Dr. Galina Vayner as of June 8, 2017; and

d. Medicare Beneficiary R.T.

194.    Other such Government Beneficiaries are can be traced by records showing the patients whose pharmacy was changed from Peachtree Pharmacy to Georgia Discount Pharmacy in December 2017 and early 2018.

195.    Based on his experience as a part-time delivery driver for **Defendant Georgia Clinic's** former on-site pharmacy, PharmaLife, and his overlapping experience as a part-time recruiter/driver/translator for **Defendant Georgia Clinic**, Relator estimates that over 90% of the Government Beneficiaries whom Georgia Clinic obtains via its illegal recruiting and free-transportation schemes, now have their prescriptions filled by **Defendant Georgia Discount Pharmacy** and that Defendants further steer their additional prescription business to **Defendants Patel and Georgia Discount Pharmacy**.

67

## VIII.  COUNTS

### COUNT ONE

### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

### Defendants' Submission of False Claims in Violation of the Anti-Kickback and Beneficiary Inducement Statutes, 42 U.S.C. §§ 1320a-7a, 7b

196.    Relator realleges and incorporates by reference the above allegations as if fully restated herein.

197.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

198.    31 U.S.C. § 3729(a)(1)(A) states that "any person who . . . knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval" is liable under the Act.

199.    By presenting false claims for payment for services that were ordered by Beneficiaries induced by the offer of free, advertised, transportation provided by recruiters paid by Georgia Clinic according to the amount of Government healthcare business they generated via referrals, Defendant Georgia Clinic knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

68

200.   The United States, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendant Georgia Clinic, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

201.   By reason of Defendant Georgia Clinic's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

202.   Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## COUNT TWO

### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

### Defendants' Submission of False Claims for Medically Unnecessary Services, 42 U.S.C. § 1320a-7a

203.   Relator realleges and incorporates by reference the above allegations as if fully restated herein.

204.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

69

205.    31 U.S.C. § 3729(a)(1)(A) states that "any person who . . . knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval" is liable under the Act.

206.    By presenting false claims for payment for diagnostic testing services it knew were not medically necessary, Defendant Georgia Clinic knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

207.    The United States, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendant Georgia Clinic, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

208.    By reason of Defendant Georgia Clinic's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

209.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## COUNT THREE

### Violation of Stark Law, 42 U.S.C. § 1395nn

70

**Defendant Georgia Clinic's Cash-for-Referral Arrangement with Defendant
Georgia Discount Pharmacy's On-site Pharmacy**

210. Relator re-alleges and incorporates by reference the allegations
contained in the preceding paragraphs of this Complaint.

211. Defendant, through the practices described above, intentionally
violated Stark, 42 U.S.C. § 1395nn by Defendant Georgia Clinic making referrals
of Medicare and Medicaid patients to Defendant Georgia Discount Pharmacy, a
provider of prescription drugs.

212. Under Stark, a "financial relationship" consists of a "compensation
arrangement." A "compensation arrangement" is any arrangement involving
any remuneration between a physician and an entity, subject to certain
exclusions. 42 U.S.C. § 1395nn(h)(1)(A). "Remuneration" includes any payment
or other benefit made directly or indirectly, overtly or covertly, in cash or in
kind, subject to certain exclusions. 42 U.S.C. § 1395nn(h)(1)(B); 42 C.F.R. §
411.351. No exclusions apply in this case.

213. Defendants, through the practices described above, intentionally
violated Stark, 42 U.S.C. § 1395nn by submitting claims to Medicare and

71

Medicaid for those services resulting from prohibited referrals of designated
health services from a physician.

## COUNT FOUR

### Violation of Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)

214.   Relator realleges and incorporates by reference the above allegations
as if fully restated herein.

215.   The Anti-Kickback Statute prohibits any person or entity from
making or accepting payment to induce or reward any person for referring,
recommending, or arranging for the purchase of any item for which payment
may be made under a federally-funded health care program.  42 U.S.C. § 1320a-
7b(b). Compliance with the Anti-Kickback Statute is a precondition to
participation and payment as a health care provider under a Government Health
Care Program.

216.   By virtue of the acts described above, Georgia Clinic and Georgia
Discount Pharmacy engaged in an illegal kickback scheme in which Georgia
Clinic was induced to and rewarded for referring patients to pharmacist Mahesh
Patel.

72

217.   Claims for reimbursement for services that result from kickbacks are false under the False Claims Act, 42 U.S.C. § 1320a-7b(g), rendering all claims for prescriptions filled by Patel false.

## COUNT FIVE

## **Violation of Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 *et seq.***

218.   Relator realleges and incorporates by reference the above allegations as if fully restated herein.

219.   This is a claim for treble damages and penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168

220.   Ga. Code Ann. §§ 49-4-168.1(a) states that "any person who . . . knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval" is liable under the Act.

221.   By presenting false claims for payment for healthcare services it knew were tainted by kickbacks or illegal inducements  and/or not medically necessary, Defendant Georgia Clinic and Georgia Discount Pharmacy knowingly presented or caused to be presented, false or fraudulent claims to the State of Georgia for payment or approval.

73

222.    The State of Georgia, unaware of the falsity of the records,

statements, and claims made or caused to be made by Defendant Georgia Clinic,

paid and continues to pay the claims that would not be paid but for Defendants'

illegal conduct.

223.    By reason of Defendant Georgia Clinic's acts, the State of Georgia

has been damaged, and continues to be damaged, in a substantial amount to be

determined at trial.

224.    Additionally, the State of Georgia is entitled to the maximum

penalty for each and every violation alleged herein.

## IX.    PRAYER FOR RELIEF

**WHEREFORE**, Relator requests that judgment be entered against Defendants,

ordering that:

i.    Defendants cease and desist from violating the False Claims Act, 31 U.S.C.
§3729, *et seq.*

ii.    Defendants pay not less than $5,500 and not more than $11,000, as
adjusted, for each violation of 31 U.S.C. §3729 committed on or before
November 1, 2015; and not less than $10,957 and not more than $21,916 for

each violation of 31 U.S.C. §3729 committed after November 1, 2015

pursuant to §3729 (a)(1) and 28 C.F.R. §85.5 or as may be further adjusted;

iii.    Relator be awarded the maximum "relator's share" allowed pursuant to 31
U.S.C. §3730(d);

iv.    Relator be awarded all reasonable attorney's fees and costs pursuant to 31
U.S.C. § 3730(d);

v.    Relator be awarded the maximum "percent of the proceeds" allowed as
well as all reasonable attorney's fees and costs, pursuant to Ga. Code Ann
§§ 49-4-168.2(i).

vi.    The United States, Georgia and the Relator recover such other relief as the
Court deems just and proper.

**PLEASE TAKE NOTICE THAT THE PLAINTIFF/RELATOR DEMANDS THE ABOVE ENTITLED ACTION TO BE TRIED TO A 12-PERSON JURY.**

Dated at this 6th day of July, 2018.

By: _____

Nola J. Hitchcock Cross
Cross Law Firm, S.C.
Attorneys for the United States of America, the State of Georgia, *ex rel.*
  Adi Demirovic, and for Adi Demirovic
The Lawyers Building, 845 N. 11th Street, Milwaukee, WI 53233
Phone: (414) 224-0000
Fax:    (414) 273-7055

njhcross@crosslawfirm.com
www.crosslawfirm.com

**Local Counsel:**

By: _____

Julie K. Bracker
Jason Marcus
Bracker & Marcus L.L.C.
Attorneys for the United States of America, the State of Georgia, *ex rel.*
 Adi Demirovic, and for Adi Demirovic
3225 Shallowford Road, Suite 1120
Marietta, GA 30062
Phone: (770) 988-5035
Fax:    (678) 648-5544
Julie@FCACounsel.com
Jason@FCACounsel.com
http://www.fcacounsel.com